# Ex. A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

COMMONWEALTH OF VIRGINIA,

        Defendant.

Case No. 3:25-cv-01067-REP

**NOTICE OF SUPPLEMENTAL AUTHORITY**

During the pretrial conference on March 18, 2026, the parties, by counsel, discussed with the Court other litigation brought by the United States challenging statutes in other states comparable to those challenged here. Pretrial Conf. Tr. at 33:14-38:10. By way of continuing to update the Court about its related litigation and as a submission of supplemental authority, Plaintiff United States of America hereby submits this Notice to the court that a decision has been reached by the United States Court of Appeals for the Fifth Circuit in *United States v. Texas*, No. 25-10898 (5th Cir. July 9, 2026). A copy of the *Texas* opinion is attached hereto as Exhibit 1.

In the matter presently pending before this Court, briefing on cross motions for summary judgment closed on May 28, 2026, and oral argument was held on July 7, 2026. Plaintiff respectfully suggests that the *Texas* decision in the United States Court of Appeals for the Fifth Circuit is pertinent to legal issues presently pending before this Court.

1

DATED: July 10, 2026                          Respectfully Submitted,


TODD W. BLANCHE                               / s/ Robert O. Lindefjeld
Acting Attorney General                       ROBERT O. LINDEFJELD (DC Bar No. 44423)
                                              Assistant Director
BRETT A. SHUMATE                              Enforcement & Affirmative Litigation Branch
Assistant Attorney General                    United States Department of Justice
Civil Division                                P.O. Box 386
                                              Washington, DC 20044-0386
SEAN SKEDZIELEWSKI                            Tel.: 202-451-7488
Counsel to the Assistant Attorney General     Email: robert.o.lindefjeld@usdoj.gov

                                              /s/ Jonathan H. Hambrick
                                              JONATHAN H. HAMBRICK (VSB No. 37590)
                                              Assistant United States Attorney
                                              Office of the United States Attorney
                                              919 East Main Street, Suite 1900
                                              Richmond, Virginia 23219
                                              Telephone: (804) 819-5400
                                              Email: jay.h.hambrick@usdoj.gov

                                              *Attorneys for the United States of America*

2

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

DATED: July 10, 2026

/s/ Robert O. Lindefjeld
ROBERT O. LINDEFJELD (DC Bar No. 44423)
Assistant Director
Enforcement & Affirmative Litigation Branch
United States Department of Justice
P.O. Box 386
Washington, DC 20044-0386
Tel.: 202-451-7488
Email: robert.o.lindefjeld@usdoj.gov

*Attorney for Plaintiff United States*

# Ex. 1

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 9, 2026

Lyle W. Cayce
Clerk

―――――――――

No. 25-10898

―――――――――

United States of America,

*Plaintiff—Appellee,*

*versus*

State of Texas,

*Defendant—Appellee,*

*versus*

Students for Affordable Tuition;
La Union del Pueblo Entero;
Austin Community College; Oscar Silva,

*Movants—Appellants.*

―――――――――――――――――――――――

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 7:25-CV-55

―――――――――――――――――――――――

Before Smith, Willett, and Ramirez, *Circuit Judges.*
Jerry E. Smith, *Circuit Judge:*

The United States sued Texas, urging that federal law preempts provisions of Texas law authorizing illegal aliens residing in Texas to pay in-state

1

No. 25-10898

tuition rates. The lawsuit tracked observations in *Young Conservatives of Texas Foundation v. Smatresk*, where the panel carefully explained that 8 U.S.C. § 1623(a) "expressly preempts state rules that grant illegal aliens benefits when U.S. citizens haven't received the same." 73 F.4th 304, 313 (5th Cir. 2023) ("*Young Conservatives*"). "Texas'[s] rule allowing illegal aliens to qualify for resident tuition" does that because out-of-state, non-resident American citizens must pay higher tuition rates than resident illegal aliens do. *Cf. id.* at 314.

Texas settled, and the parties entered into a consent judgment that the district court approved. Two advocacy groups, a community college, and a student sought to intervene and undo the consent judgment. The district court denied intervention, reasoning that any attempt to intervene would be futile because the statute was preempted.

The district court correctly denied intervention after concluding that they could not plausibly defend the preemption claim. Section 1623(a) preempts what we call the Challenged Provisions[1] *vis-à-vis* illegal aliens, barring states from conferring postsecondary education benefits on any illegal alien based on residence unless the same benefit is available to all U.S. citizens and nationals irrespective of residency.

We AFFIRM the denial of the motions to intervene and dismiss the remaining claims for want of appellate jurisdiction.

## I

Like other states, Texas charges its "residents one price for public college and charge[s] those who live elsewhere much more." *Young Conservatives*, 73 F.4th at 307. Though residents pay a discounted rate, typically

---

[1] Tex. Educ. Code § 54.051(m); *id.* § 54.052(a).

No. 25-10898

$50 per credit hour, nonresidents pay full price, which is based on "the average of the nonresident undergraduate tuition charged to a resident of this state at a public state university in each of the five most populous" non-Texas states. Tex. Educ. Code § 54.051(c), (d).

The Texas Education Code ("Code") provides three ways students can establish residency, each predicated on establishing a "domicile" or "residence" within Texas. *Id.* § 54.052(a) (titled "Determination of Resident Status"). The Code states that "[*u*]*nless the student establishes residency* or is entitled or permitted to pay resident tuition as provided by this subchapter, tuition for a student who is a citizen of any country other than the United States . . . is the same as the tuition required of other nonresident students." *Id.* § 54.051(m) (emphasis added). Collectively, sections 54.051(m) and 54.052(a) (the "Challenged Provisions") improperly authorize—contrary to federal law— illegal aliens who meet state residency requirements to obtain discounted tuition rates without ensuring that all U.S. citizens or nationals can access such rates.

In June 2025, the United States sued Texas to prohibit enforcement of the Challenged Provisions, alleging that Texas had "ignored" federal law[2] "for years" by permitting illegal aliens to pay in-state resident tuition while requiring out-of-state U.S. citizens to pay higher nonresident rates. Alongside § 1623(a)'s plain language, the complaint relied on *Young Conservatives*, which noted that § 1623(a) "expressly preempts state rules that grant illegal

---

[2] "*Notwithstanding any other provision of law*, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a) (emphasis added) (titled "Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits").

No. 25-10898

aliens benefits when U.S. citizens haven't received the same." 73 F.4th at 313. Though *Young Conservatives* found that a different Code provision was not preempted, the panel observed that "a different, *unchallenged* portion of Texas'[s] scheme seems to conflict with § 1623(a)"—referencing the Challenged Provisions—because the provisions "allo[w] illegal aliens to qualify for resident tuition." *See id.* at 314.

The district court approved the consent judgment and issued a final judgment permanently enjoining Texas from enforcing Texas Education Code § 54.051(m) and § 54.052(a). Thereafter, Austin Community College ("ACC"), La Union del Pueblo Entero ("LUPE"), and Oscar Silva (collectively, the "LUPE Group"), and Students for Affordable Tuition ("SAT") moved to intervene post-judgment. Separately, the LUPE Group filed a motion for relief from the final judgment, or to alter or amend it, under Federal Rules of Civil Procedure 59(e) and 60(b).

In August 2025, the district court denied both groups' motions, explaining that "intervention is legally futile" "because federal law—specifically, 8 U.S.C. § 1623(a)—preempts the challenged Texas provisions." Quoting *Young Conservatives*, 73 F.4th at 308, the district court elucidated that, under the Challenged Provisions, "illegal aliens are eligible for Texas resident tuition," but "[o]ut-of-state, nonresident American citizens are not," and "[f]ederal law—[s]ection 1623(a)—bars such a disparity." The district court held that "[s]ections 54.051(m) and 54.052(a) are expressly preempted"; reasoned that the intervention motions "are legally futile"; and separately dismissed as moot the LUPE Group's motion to vacate the final judgment under Rules 59 and 60. An administrative panel of this court denied Appellants' motion for stay pending appeal.

II

Denials of intervention as of right are reviewed *de novo*. *Texas v.*

No. 25-10898

*United States*, 805 F.3d 653, 656 (5th Cir. 2015) (citing *Edwards v. City of Hous.*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)).[3]  So are inquiries into whether state statutes are preempted by federal law.[4]  Denials of permissive intervention are reviewed for "clear abuse of discretion."[5]  We "may also affirm on any ground supported by the record, including one not reached by the district court."  *Harrison v. Young*, 103 F.4th 1132, 1135 (5th Cir. 2024) (citation omitted).

--------

[3] 6 Edward J. Brunet et al., MOORE'S FEDERAL PRACTICE (hereinafter "MOORE'S") § 24.24[2][b] (3d ed. 2026) ("There is a conflict among the circuits regarding the standard that should be used in reviewing a district court's determination of whether a movant has a right to intervene under Rule 24(a)(2), which deals with non-statutory intervention as of right . . . .  The Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have held that decisions on motions to intervene as of right are to be reviewed de novo." (citations omitted)); *id.* (noting that "the de novo standard . . . is more true to the text of the rule").

[4] *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001) ("Whether a state statute or common law cause of action is preempted by federal law is a question of law we review *de novo*.  Preemption under the Supremacy Clause of the federal Constitution may arise in several ways, *i.e.*, (1) express preemption where the intent of Congress to pre-empt state law is clear and explicit; (2) field preemption . . . and (3) conflict preemption" (citations omitted)); 6 MOORE'S § 24.24[2][c] ("*If an appeal involves issues of law*, an appellate court will review de novo, even if denial of a motion for permissive intervention forms the basis of the appeal." (citations omitted; emphasis added)).

[5] *8fig, Inc. v. Stepup Funny, L.L.C.*, 135 F.4th 285, 291 (5th Cir. 2025); 6 MOORE'S § 24.24[2][c] ("A reversal for abuse of discretion in this context 'by any federal appellate court is so unusual as to be almost unique.'  If a district court's denial of permissive intervention is the basis for appeal, and there was no abuse of discretion, the appellate court must dismiss the appeal for lack of jurisdiction." (citing, *inter alia*, *Rotstain v. Mendez*, 986 F.3d 931, 942 (5th Cir. 2021) ("We have 'provisional jurisdiction' to review a district court's order denying permissive intervention.  If the district court did not abuse its discretion by denying permissive intervention, we 'must dismiss the appeal for lack of jurisdiction.'  We retain jurisdiction and reverse if the district court abused its discretion."))).

5

No. 25-10898

III

A

"[A] proper basis for denying leave to intervene may be a finding that the proposed intervention would fail to state a claim." *Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104, 1109 (5th Cir. 1991) (citations omitted).[6] We evaluate a putative intervenor's pleadings under the "general rules on testing a pleading; the factual allegations of the complaint are assumed to be true, and the pleading is construed liberally in support of the pleader." *Pin v. Texaco, Inc.*, 793 F.2d 1448, 1450 (5th Cir. 1986) (citations and internal quotations omitted). Put differently, the standards of Rule 12(b) apply.[7] Thus, a claim need not be frivolous to be futile. Futility analyses are "threshold matter[s that a] district judge *must* [conduct] . . . *before* . . . turn[ing] to a consideration of the factors listed in Rule 24(a) and (b)." *Pin*, 793 F.2d at 1450 (emphases added).

Appellants' attempts to sidestep a futility analysis are unavailing. *First*, Appellants assert that requiring intervenors to demonstrate their intervention would not be futile amounts to wrongly requiring them to "prove . . . they have a winning argument on the merits before allowing them to participate" in the case. Not so. Futility analyses are "threshold matter[s]" that require prospective intervenors to pass Rule 12(b)(6) muster. *See id.* Appellants do not cite any authority holding that futility is inapplicable when anal-

---

[6] 6 MOORE'S § 24.20 ("Proper procedure for a motion to intervene requires the movant to serve a proposed pleading-in-intervention with the motion . . . . The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." (citations omitted)).

[7] *Pin*, 793 F.2d at 1450 (noting Rule 12(b)(6) as analogous); *see also Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000) ("[T]o determine futility, we will apply the same standard of legal sufficiency as applies under Rule 12(b)(6)." (citations and internal quotations omitted)).

No. 25-10898

yzing a motion to intervene.

*Second*, the LUPE Group theorizes that futility does not apply to defense-side intervenors.  But our sister circuits have long held that futility rules apply to both plaintiff- and defense-side intervenors,[8] and we now join that longstanding practice.  Indeed, Appellants do not provide contrary authority excusing defense-side intervenors from futility analyses.  Contrary to the LUPE Group's contention that the district court "got things backwards," the court properly conducted a threshold futility analysis, consistent with *Pin*'s command that courts "must" conduct futility analyses "before" proceeding to Rule 24(a) and (b) inquiries.  *See Pin*, 793 F.2d at 1450.

1

Intervention is futile because federal law preempts the Challenged Provisions.

Reenter *Young Conservatives*, where students sued a state university and posited that a Texas law setting tuition rates for nonresidents was preempted by § 1623(a) because the Texas law allegedly required out-of-state students to pay higher tuition rates while permitting illegal aliens to pay lower rates.  73 F.4th at 307–08; Tex. Educ. Code § 54.051(d)).  There, we observed that "[s]ection 1623(a) contains an express preemption clause,"

---

[8] *See, e.g.*, *Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.*, 840 F.2d 72, 75 (D.C. Cir. 1988) ("An application to intervene should be viewed on the tendered pleadings—that is, whether those pleadings allege a legally sufficient claim or defense." (citations omitted)); *Hispanic Soc'y of the N.Y.C. Police Dep't v. N.Y.C. Police Dep't*, 806 F.2d 1147, 1154 (2d Cir. 1986) ("The need for formal intervention is thus as great as the need for named plaintiffs or defendants to state a well-pleaded claim or defense." (citations omitted)); *see also id.* ("Because the requirements for intervention as a party have been ignored, the people pursuing this appeal have no more standing than individuals selected at random from a telephone book." (citation omitted)); *R.I. Fed'n of Tchrs., AFL-CIO v. Norberg*, 630 F.2d 850, 851 (1st Cir. 1980) (affirming "denial of intervention . . . on the grounds that [nonparties] failed to plead a colorable defense to the challenged statute").

which directs that "[n]otwithstanding any other provision of law," an illegal alien "shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." 73 F.4th at 312 (quoting § 1623(a)). But in *Young Conservatives*, we held that "[s]ection 54.051(d)—the one and only section challenged"—was not expressly preempted because section 54.051(d) "does nothing more than set the tuition price for nonresident students, citizens or not" and "takes no stance on whether illegal aliens are eligible for a cheaper price."[9]

Still, we made clear that other provisions of Texas's law were problematic—"a different, *unchallenged* portion of Texas'[s] scheme seems to conflict with § 1623(a)." *Id.* at 314. Now enter the Challenged Provisions at issue here—sections 54.051(m) and 54.052, which concern the "portion[s] of Texas'[s] scheme [that] conflict with § 1623(a)," namely the "state rules that grant illegal aliens benefits when U.S. citizens haven't received the same." *See id.* at 313–14.

Section 54.051(m) requires "tuition for a student who is a citizen of any country other than the United States" to be "the same as the tuition required of other nonresident students"—"[u]nless the student establishes residency." TEX. EDUC. CODE § 54.051(m). The other Challenged Provision—section 54.052—describes three ways in which a person may establish residency in Texas, none of which requires lawful presence. *See id.* § 54.052(a)(1)–(3). Under the Challenged Provisions, "[s]o long as [illegal aliens] satisfy the statute's residency requirements, illegal aliens are eligible

---

[9] *Cf.* 73 F.4th at 313 ("Section 1623(a) has nothing to say about a rule like that. Therefore, § 54.051(d) is not expressly preempted by § 1623(a).").

No. 25-10898

for Texas resident tuition.  Out-of-state, nonresident American citizens are not."  *See Young Conservatives*, 73 F.4th at 308.  We agree with the district court that § 1623(a) "bars such a disparity."

2

Appellants lodge six challenges to the district court's preemption analysis.  The first three concern the interpretation of § 1623(a) and the Challenged Provisions.  Appellants invoke the presumption against preemption, the Tenth Amendment, and severability principles in the three latter challenges.

a

The Challenged Provisions grant in-state tuition benefits to illegal aliens on the basis of residency.

Appellants aver that the Challenged Provisions are not preempted because they supposedly base in-state tuition eligibility on factors beyond residency, and § 1623(a) preempts only state laws that afford illegal aliens postsecondary benefits "on the basis of residence within a [s]tate."

Appellants' position is inconsistent with the text and structure of the Challenged Provisions and federal statutory law.  Section 54.052 describes three circumstances under which "persons are considered residents of this state": *First*, when a person "established a domicile in this state not later than one year before the census date of the academic term in which the person is enrolled in an institution of higher education" and "maintained that domicile continuously for the year preceding that census date"[10]; *second*, when a "dependent['s] . . . parent" meets those same "domicile" requirements[11];

_____

[10] Tᴇx. Eᴅᴜᴄ. Cᴏᴅᴇ § 54.052(a)(1)(A)–(B).

[11] *Id.* § 54.052(a)(2).

9

and *third*, when a person "graduated from a public or private high school in this state or received the equivalent of a high school diploma in this state" and "maintained a residence continuously in this state" for "the three years preceding the date of graduation or receipt of the diploma equivalent" and "the year preceding the census date of the academic term in which the person is enrolled in an institution of higher education."[12]  Each of the three pathways is tethered to establishing a "domicile" or "residence" within Texas. *See* § 54.052 (titled "Determination of *Resident* Status" (emphasis added)).

Neither do Appellants adequately dispute that two out of these three pathways concern residency and are therefore preempted by § 1623(a).[13] Instead, Appellants focus on the third pathway, claiming that because section 54.052(a)(3) does not make the residency determination[14] turn "solely"

---

[12] *Id.* § 54.052(a)(3).

[13] Aside from its threadbare statement that "[n]o provision of Texas law grants persons without lawful presence access to in-state tuition on 'the basis of residence within' Texas," the LUPE Group does not adequately dispute that the first two pathways, outlined in sections 54.052(a)(1)–(2), concern residency. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument . . . by failing to adequately brief the argument on appeal."). After all, in their opening briefs, neither the LUPE Group nor SAT discusses, in any detail, sections 54.052(a)(1)–(2), which both use "domicile" instead of "residence." *See id.*

Appellants cannot claim, later or otherwise, that there is a supposed difference between "domicile" and "residence" when they do not adequately dispute that these two pathways concern residency. *See id.*  Nor can Appellants salvage their contentions by raising arguments for the first time in a reply brief. *See United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) (per curiam) ("Arguments raised for the first time in a reply brief, even by pro se litigants such as Jackson, are waived." (citation omitted)); *see also United States v. Stuart*, 132 F.4th 892, 904 (5th Cir. 2025) ("And having asserted actual prejudice for the first time in his reply brief, he has forfeited that argument." (citing *Jackson*, 426 F.3d at 304 n.2)).

[14] The LUPE Group suggests that the Challenged Provisions are not preempted because there is a purported difference between the federal and state definitions of "residence," with the former defined as a person's "principal, actual dwelling place in fact, without regard to intent," and the latter as "a person's home or other dwelling place."

upon residence but also includes a high-school-graduation component, residency is not "*the* basis of" the provision of post-secondary educational benefits for purposes of § 1623(a).

Appellants' theory is ungrounded. Section 54.052(a)(3) makes residency turn on two elements: (A) graduation from a public or private high school (or the equivalent of a high school diploma) in Texas "*and*" (B) continuous residency requirements. "[A]nd" requires both elements be present to establish residency. *See United States v. Palomares*, 52 F.4th 640, 643 (5th Cir. 2022) (recognizing that the "ordinary meaning of 'and' . . . is conjunctive"). In other words, residency, for the purposes of in-state tuition, cannot be established under section 54.052(a)(3) without satisfying the continuous-residence requirement, which is "the basis" for the provision of postsecondary benefits. *See* § 1623(a). Plainly put, residence is a necessary condition for in-state tuition in Texas.

Section 1623(a) does not limit its preemptive effect to state-law residency determinations based on a single factor.[15] "No doubt, Congress could have taken a more parsimonious approach. As it has in other statutes, [Congress] could have added 'solely' to indicate that actions taken 'because of'

---

8 U.S.C. § 1101(a)(33); Tex. Educ. Code § 54.0501(6). But there is not a material difference between these two definitions. Any creative contention that a person could satisfy Texas's residency definition with a secondary, non-"principal" residence that is not "in fact" his "actual dwelling place" is inconsistent with the ordinary meaning of a "home or other dwelling place." Shoehorning an interpretation of "residence" to exploit a potential discrepancy, where there is none, is inappropriate. In any event, the distinction without a difference is meritless because residence is a necessary condition for in-state tuition in Texas, and the Challenged Provisions grant in-state tuition benefits to illegal aliens on the basis of residency.

[15] This makes intuitive sense because tuition benefits are rarely given on the basis of residence alone—residence is usually tied to a length of time, or as in this case, graduation from a Texas school.

the confluence of multiple factors do not violate the law." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) (citations omitted). "But none of this is the law we have." *Id.* at 657.[16] "In the language of law, this means that" § 1623(a)'s on-the-basis-of test "incorporates the simple and traditional standard of but-for causation." *See id.* at 656 (citation and internal quotations omitted). Indeed, the phrase "*on the basis of*" is "strongly suggestive of a but-for causation standard." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 335 (2020) (citation omitted). Appellants present little to no authority that "on the basis of" should warrant anything other than a but-for standard. The but-for test is satisfied here—continuous residency is one of the two requirements to establish residency under section 54.052(a)(3) and is a but-for cause of the provision of postsecondary education benefits and "the basis of" their provision within § 1623(a)'s meaning.

b

Discounted in-state tuition is prototypical monetary assistance that qualifies as a postsecondary educational benefit within the meaning of § 1623(a).

The LUPE Group maintains that the Challenged Provisions are not preempted by § 1623(a) because discounted tuition rates do not constitute a "postsecondary education benefit," borrowing the definition of "[s]tate or local public benefit" from a different federal statute[17] and concluding that

---

[16] *Cf. Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–18 (6th Cir. 2012) (en banc) (declining to read "solely" into the ADA to modify "because of" language). Though *Bostock* interpreted the statutory phrase "because of" rather than "on the basis of," "there is [no] meaningful difference between 'on the basis of,' 'because of,' or 'based on,' which would require courts to use a causation standard other than 'but-for.'" *See Natofsky v. City of N.Y.*, 921 F.3d 337, 349 (2d Cir. 2019); *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016) (same) (citations omitted).

[17] 8 U.S.C. § 1621(c)(1)(B) (defining the phrase to include "any . . . postsecondary

"[e]ligibility for in-state tuition does not fit that definition" because eligibility is "nothing more than a status" that does not involve government "payments" or "assistance."

But the LUPE Group's theory is flawed. For one, it is not definitive that § 1621(c)(1)(B)'s definition applies to § 1623. Even so, the Challenged Provisions afford recipients a financial subsidy to pay discounted tuition. After all, in-state tuition is about one-tenth the amount of out-of-state tuition[18] and represents a monetary form of assistance, not merely a hollow status. In brief, discounts on tuition are "benefits" that take the form of a fiscal subsidy. *See* § 1623(a) (discussing "amount, duration, and scope"). Specifically, the amount of the discount is the difference between the out-of-state and in-state tuition, the duration is the number of semesters the recipient pays the in-state tuition, and the scope relates to the types of costs covered.

c

Isolated exceptions to Texas's in-state tuition rules do not disable the application of § 1623(a).

Appellants urge that the Challenged Provisions are not preempted because the Code permits some out-of-state U.S. citizens to pay in-state tuition rates in discrete circumstances, suggesting that the indefinite article "a" in the clause "unless *a* citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such

---

education . . . benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government").

[18] *Compare Young Conservatives*, 73 F.4th at 308 ("Nonresident tuition instead totals $458 per semester credit hour."), *with id.* ("Texas resident tuition is pegged at $50 per semester credit hour.").

a resident" renders § 1623(a)'s application a nullity so long the LUPE Group can identify a single U.S. citizen who might pay in-state tuition regardless of residence. *See* § 1623(a) (emphasis added).

Eligibility for one U.S. citizen or national in a discrete circumstance cannot unlock preferential in-state tuition for all illegal aliens when other citizens or nationals are excluded from consideration. The LUPE Group's theory "misses the point" because its attempt to extract dispositive meaning from the indefinite article "a" reprises an "abstruse grammatical debate" that we have previously rejected.[19] In fact, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). And the Dictionary Act provides that "words importing the singular include and apply to several persons, parties, or things," unless context indicates otherwise.[20]

Section 1623(a) is a categorical prohibition, whose reference to "a citizen or national" naturally reads to include the plural, and contains no capacious escape hatch allowing a state to satisfy the "unless" condition by iden-

---

[19] *See La Union del Pueblo Entero v. Abbott*, 151 F.4th 273, 292 n.18 (5th Cir. 2025) ("The parties dispute whether the article 'a' here means 'any' or 'one' or 'some.' That abstruse grammatical debate misses the point. We are not reading a single article but an entire phrase—'a person of the voter's choice.'"), *cert. denied*, --- S. Ct. ----, 2026 WL 1855021 (June 29, 2026) (No. 25-904), *and cert. denied*, --- S. Ct. ----, 2026 WL 1855121 (June 29, 2026) (No. 25-916).

[20] 1 U.S.C. § 1; *see, e.g.*, *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 975 n.52 (5th Cir. 2016) (noting that "[i]t is a basic rule of statutory construction that the singular includes the plural" and "the fact that 'examiner' is singular is hardly dispositive" (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 130 (2012) (referencing 1 U.S.C. § 1))).

tifying a single U.S. citizen or national somewhere who can obtain the benefit *vis-à-vis* a limited exception.[21] We employ the anti-surplusage canon as "an interpretive aid"[22] to "give effect . . . to every word and every provision Congress used."[23] If § 1623(a)'s "a citizen or national" phrase could be satisfied by a narrow subset of persons, the "unless" condition would not do meaningful work in constraining a state's provision of postsecondary education benefits to illegal aliens.[24] Otherwise, an enterprising litigant could just point to some U.S. citizen or national made eligible under a narrow path while improperly denying in-state benefits to the rest of the citizenry.

Read naturally, the "unless" clause describes a condition precedent that must be satisfied *before* states may bestow residence-based postsecondary education benefits on illegal aliens. *See* § 1623(a). Put another way, if some U.S. citizens or nationals, regardless of residency, are ineligible for reduced in-state tuition rates, then all illegal aliens must be ineligible to receive the same benefit based on residency.[25] U.S. citizens or nationals must be treated no worse than illegal aliens.

d

The presumption against preemption is inapplicable because

---

[21] *See* § 1623(a); *Seth B.*, 810 F.3d at 975 n.52; *Asadi*, 720 F.3d at 622.

[22] *See Corley v. United States*, 556 U.S. 303, 325 (2009) (ALITO, J., dissenting) ("Like other canons, the antisuperfluousness canon is merely an interpretive aid, not an absolute rule." (citations omitted)).

[23] *See Asadi*, 720 F.3d at 622 (citing, *inter alia*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

[24] *See Duncan*, 533 U.S. at 174; *Asadi*, 720 F.3d at 622.

[25] *See Young Conservatives*, 73 F.4th at 312 ("[T]he statute [§ 1623(a)] simply requires that all U.S. citizens be eligible for a benefit, without regard to residency, before any alien be able to receive the same benefit (based on residency).").

§ 1623(a) contains an express-preemption clause.  The LUPE Group posits that the presumption against preemption should apply to defeat preemption. But when a statute "contains an express preemption clause," we "do[] not indulge 'any presumption against preemption but instead focus[] on the plain wording of the clause, which necessarily contains the best evidence of Congress'[s] preemptive intent.'"  *Young Conservatives*, 73 F.4th at 311 (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)).  Section 1623(a)'s express federal preemption provision displaces any state-law tuition disparity benefiting illegal aliens.

e

Preemption of the Challenged Provisions does not violate the Tenth Amendment.  Still, Appellants claim that the district court's plain-text reading of § 1623(a) implicates the Tenth Amendment by directly regulating states' authority over education and triggers the constitutional avoidance canon of construction.

The Appellants' theory is incorrect for at least two reasons.  *First*, constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."  *Nielsen v. Preap*, 586 U.S. 392, 419 (2019) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)).  "The canon 'has no application' absent 'ambiguity.'"  *Id.* (quoting *Warger v. Shauers*, 574 U.S. 40, 50 (2014)).  Section 1623(a)'s text unambiguously "cuts . . . against" Appellants' position, "making constitutional avoidance irrelevant."  *See id.*

*Second*, § 1623(a) "declare[s] a limitation on illegal eligibility itself" and does not "regulate[] states directly."[26]  Section 1623(a) is ordinary pre-

---

[26] *Cf. id.* at 312–13 (noting that "the district court's rewrite" of the statute "applied an entirely different rule than the one Congress passed").

emption legislation that "denies permission," not a command to, or direct regulation of, the states.[27]  After all, § 1623(a) does not impose any "affirmative obligation to give citizens benefits granted to aliens."[28]   Section 1623(a)'s self-executing provision "merely targets offending *laws*" and does not implicate the Tenth Amendment, much less run afoul of "the anti-commandeering doctrine . . . , [which] is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *See id.*; *Murphy v. NCAA*, 584 U.S. 453, 470 (2018).

f

Appellants' severability assertions are unavailing.  Appellants maintain that the district court should not have found all of section 54.052(a)(3) preempted but instead severed subsections (A) and (B) because (A) discusses Texas high school attendance and (B) discusses residence length, reasoning

---

[27] *See id.* ("No matter what a state says, if a state did not make U.S. citizens eligible, illegal aliens cannot be eligible.  But, to be clear, § 1623(a) doesn't impose *any* duty to grant the same benefits to U.S. citizens." (citation omitted)); *see also id.* at 312 ("That latter reading of 'shall not' is the better understanding here: it denies permission.  Otherwise, § 1623 would impose a duty on *illegal aliens* to not be eligible for benefits if citizens are not.  That outcome wouldn't make sense.  Instead—with 'shall not' given proper effect—the statute simply requires that all U.S. citizens be eligible for a benefit, without regard to residency, before any alien be able to receive the same benefit (based on residency).  Hence the title, 'Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits.'  In doing so, [§ 1623(a)] merely targets offending *laws*.").

[28] *Cf. id.* at 312 (noting that the district court erred in "convert[ing] Section 1623's unless clause—a condition precedent to granting a benefit to aliens—into an affirmative obligation to give citizens benefits granted to aliens.  This led the [district] court to *require* states to grant benefits to citizens if [states] grant those benefits to illegal aliens.  Per the UNT officials, this improperly rewrites Congress's prohibitory statute" (internal quotations omitted)).

that only (B) should have been enjoined.

Applying severability law, we ask whether—after the "unconstitutional portion is stricken out"—the remainder is "complete in itself" and is "capable of being executed in accordance with the apparent legislative intent," "*wholly* independent" of what was removed.  *Nat'l Fed'n of the Blind, Inc. v. Abbott*, 647 F.3d 202, 211, 215 (5th Cir. 2011) (emphasis added) (applying Texas severability law).  Appellants' abstract approach fails the "complete-in-itself" requirement because the approach would not preserve the statute's "apparent legislative intent."  *See id.*  Intuitively, subsections (A) and (B) were written to work in tandem:  Subsection (A) is a proxy for residence (*i.e.*, graduating from a high school in Texas), and subsection (B) ensures that the high-school graduate was a Texas resident during high school plus one year after—not merely transiently present.  TEX. EDUC. CODE § 54.052(a)(3)(A), (B).  Appellants' severability approach would do more than just "strike" offending text, by inappropriately changing who qualifies and on what terms and instead mandating a broader, high-school-graduation-only eligibility pathway to residency that Texas never enacted.

3

All of Appellants' preemption contentions are meritless.  Thus, we begin and end with the futility analysis and need not address whether Appellants can satisfy Rule 24 (a)'s or (b)'s intervention requirements.

IV

We dismiss the remaining claims for want of appellate jurisdiction.

A

Appellants are nonparties and cannot appeal the consent judgment. "It is well-settled that one who is not a party to a lawsuit, or has not properly become a party, has no right to appeal a judgment entered in that suit."

*Edwards*, 78 F.3d at 993 (citations omitted).  "[I]ntervention is the requisite method for a nonparty to become a party to a lawsuit." *U.S. ex rel. Eisenstein v. City of N.Y.*, 556 U.S. 928, 933 (2009) (citation omitted).

Notably, the only Appellants here "are would-be intervenors whose attempts to join the case . . . were unsuccessful." *Edwards*, 78 F.3d at 993. The LUPE Group wrongly relies on *Edwards*, where our en banc court vacated a consent decree concerning a different group of appellants who were already parties to the case and did not need to intervene. *See id.* at 993–94, 1006 n.29.  Because the instant Appellants "were denied leave to intervene, and thus never obtained the status of party litigants in this suit, we dismiss their appeals, insofar as they seek review of the district court's" approval of the consent judgment. *See id.* at 993.[29]

_____

[29] 6 MOORE'S § 24.20 ("[T]he intervenor is not considered a party unless leave to intervene is granted." (citing, *inter alia*, *White v. Tex. Am. Bank/Galleria*, 958 F.2d 80, 83 (5th Cir. 1992) ("[U]ntil the Appellants received leave to intervene, they were not parties to the suit and, consequently, had no standing to be served or to respond to NCNB's summary judgment motion . . . . It was only when the court permitted [Appellants] to intervene that the Appellants became parties to the action, equal in status to the original parties." (citations omitted)))); *see, e.g.*, *Texas v. United States*, 679 F. App'x 320, 324 (5th Cir. 2017) (per curiam) (explaining that appellant "has not cited any authority, and we have found none (outside those involving collateral orders), in which this court has allowed a nonparty to appeal without intervening and without having actually participated in the proceedings below" (citations omitted)); *Franciscan All., Inc. v. Cochran*, No. 17-10135 (5th Cir. June 30, 2017) (per curiam), ECF No. 82-1, at 3 (ordering "that because appellants have not been granted intervention and are not parties to this case, we lack jurisdiction to adjudicate the merits of the protective appeal from the preliminary injunction order").

Our sister circuits have acted consistently.  *See United States v. City of Milwaukee*, 144 F.3d 524, 531 (7th Cir. 1998) ("We have recognized repeatedly that, until a movant for intervention is made a party to an action, it cannot appeal any orders entered in the case other than an order [] denying intervention." (citations omitted)); *see also Robert Ito Farm, Inc. v. Cnty. of Maui*, 842 F.3d 681, 687 (9th Cir. 2016) ("[A] prospective intervenor does not become a party to the suit unless and until he is allowed to intervene."); *cf. Toronto-Dominion Bank v. Cent. Nat'l Bank & Tr. Co.*, 753 F.2d 66, 68 (8th Cir. 1985) ("Because

No. 25-10898

B

The district court did not abuse its discretion in denying the nonparty Appellants' motion to alter or amend the judgment under Rule 59(e) or 60(b).[30] In the permissive intervention context, "[w]e have provisional jurisdiction to review a district court's order denying permissive intervention. If the district court did not abuse its discretion . . . , we must dismiss the appeal for lack of jurisdiction."[31] So too here. There being no abuse of discretion, we dismiss for want of appellate jurisdiction.

\* \* \*

The order denying intervention is AFFIRMED, and the remaining claims are DISMISSED for want of appellate jurisdiction.

_____

the motion to intervene has not yet been granted or denied, BNB's status remains uncertain and it has no standing to take an appeal or appear as a party."); *accord* FED. R. APP. P. 3(c)(1)(A) (requiring notice of appeal to "specify the *party* or *parties* taking the appeal" (emphasis added)); *id.* 8(a)(1) ("A *party* must ordinarily move first in the district court for the following relief: (A) a stay of the judgment or order of a district court pending appeal." (emphasis added)).

[30] *See* FED. R. CIV. P. 60(b) ("On motion and just terms, the court may relieve a *party* or its legal representative from a final judgment." (emphasis added)). This logic extends to Rule 59(e) motions. *See Ross v. Marshall*, 426 F.3d 745, 752–53 (5th Cir. 2005) (discussing the distinction between a Rule 59(e) motion filed by nonparties and one filed by parties).

[31] *See Rotstain*, 986 F.3d at 942 (citation and internal quotations omitted); 6 MOORE'S § 24.24[2][c] ("If a district court's denial of permissive intervention is the basis for appeal, and there was no abuse of discretion, the appellate court must dismiss the appeal for lack of jurisdiction.").

20

No. 25-10898

Irma Carrillo Ramirez, *Circuit Judge*, dissenting:

Six hours after the United States sued the State of Texas, the district court entered a consent judgment invalidating the 25-year-old Texas Dream Act based on the parties' agreement that the law is preempted by 8 U.S.C. § 1623(a). It then denied Appellants' attempts to intervene to defend the Texas law. Because its existence is unclear, I would remand for the district court to evaluate its jurisdiction under Article III in the first instance. Even if jurisdiction exists, because the district court's evaluation of Appellants' motions to intervene was incomplete, and § 1623(a) is not a valid preemption statute under the Tenth Amendment, I respectfully dissent.

## I

### A

In 1996, Congress enacted 8 U.S.C. § 1623, which "[l]imit[s] . . . eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits." It states:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a).

Five years later, the Texas legislature passed the Texas Dream Act, which allows eligible noncitizens to pay the lower "resident"—in-state—tuition rate if they meet certain criteria. Section 54.051(m) of the Texas Education Code provides that students who are noncitizens generally pay the same tuition as nonresidents "[u]nless the [noncitizen] student *establishes*

21

No. 25-10898

*residency* or is entitled or permitted to pay resident tuition as provided by this subchapter." TEX. EDUC. CODE § 54.051(m) (emphasis added).

Section 54.052, governing "Determination of Resident Status," provides three ways to establish residency. *Id.* § 54.052(a). The third method outlined in § 54.052(a)(3), the only one at issue in this case, provides residency without regard to immigration status for:

> (3) a person who
>
>> (A) graduated from a public or private high school in [Texas] or received the equivalent of a high school diploma in [Texas]; and
>>
>> (B) *maintained a residence continuously* in [Texas] for:
>>
>>> (i) the three years preceding the date of graduation or receipt of the diploma equivalent, as applicable; and
>>>
>>> (ii) the year preceding the census date of the academic term in which the person is enrolled in an institution of higher education.

*Id.* § 54.052(a)(3) (emphasis added). "[I]f the person" applying for residency under § 54.052(a)(3) "is not a citizen or permanent resident of the United States," that person must also submit "an affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible to apply." *Id.* § 54.053(3).

## B

On June 4, 2025, the United States sued Texas, asserting that §§ 54.051(m) and 54.052(a) (the "Challenged Provisions") are expressly preempted by § 1623(a), and therefore unconstitutional under the Supremacy Clause, "as applied to aliens not lawfully present in the United

No. 25-10898

States."[1] Its complaint relied primarily on a prior decision of this court, *Young Conservatives of Texas Foundation v. Smatresk*, which held that § 54.051(d) of the Texas Education Code was *not* preempted by § 1623(a). 73 F.4th 304, 314–15 (5th Cir. 2023).

Within approximately six hours, the parties settled, and the district court granted their joint motion for entry of a "consent judgment." The consent judgment declared the Challenged Provisions unconstitutional "as applied to aliens who are not lawfully present in the United States" and permanently enjoined their enforcement. The district court did not invite any substantive briefing—adversarial or otherwise—before entering the consent judgment.

That same day, the Texas Attorney General issued a press release explaining that he "[s]uccessfully stopped a law that unconstitutionally provided in-state tuition to illegal aliens" by "enter[ing] a joint motion along with the Trump Administration." The Justice Department, in turn, "commend[ed] Texas leadership and [the Texas Attorney General] for swiftly working with [it]." Another Justice Department official explained that the United States and Texas were able to "g[et] rid of [the Texas Dream Act] in six hours" because they "talk[ed] in advance."

---

[1] The United States' lawsuit against Texas is one of many targeting similar laws in other states. *See, e.g.*, *United States v. Walz*, No. 25-CV-2668 (KMM/DTS), 2026 WL 851231, at *1 (D. Minn. Mar. 27, 2026); *United States v. Nebraska*, No. 8:26CV172, 2026 WL 1584862 (D. Neb. June 3, 2026); *United States v. Ky. Council on Postsecondary Educ.*, No. 3:25-CV-00028-GFVT, 2026 WL 880597 (E.D. Ky. Mar. 31, 2026); *United States v. Oklahoma*, No. 25-CV-265-RAW-DES, 2025 WL 2815662 (E.D. Okla. Aug. 7, 2025), *report and recommendation adopted*, No. CIV-25-265-RAW-DES, 2025 WL 2815660 (E.D. Okla. Aug. 29, 2025).

23

No. 25-10898

Within three weeks, the LUPE Group[2] and Students for Affordable Tuition (SAT) (collectively, "Appellants") moved to intervene as defendants under Federal Rule of Civil Procedure 24, seeking to appeal the consent judgment and defend the Challenged Provisions. Their motions focused on the Rule 24 intervention factors and did not substantively address the merits of the constitutional issues presented in the United States' complaint. The LUPE Group, however, contemporaneously filed (1) a motion to vacate the consent judgment, or to alter or amend it, under Rules 59(e) and 60(b); and (2) a motion to stay the consent judgment and corresponding injunction pending resolution of the motion to vacate. Those motions asserted, among other things, that the district court lacked subject matter jurisdiction to enter the consent judgment and that the Challenged Provisions were not preempted. SAT filed a proposed answer along with its motion to intervene, which challenged the United States' allegations of express preemption and asserted that § 1623(a) violates the Tenth Amendment.

The district court ordered the United States and Texas (collectively, "Appellees") to respond to Appellants' motions to intervene, but it stayed briefing on the LUPE Group's motion to vacate and motion to stay until it ruled on intervention. Appellees responded that the motions to intervene should be denied because intervention was futile—i.e., Appellants asserted no viable defenses to the United States' claim that the Challenged Provisions are expressly preempted by § 1623(a). Because Appellants' motions to intervene focused on the Rule 24 factors, the only opportunity they had to substantively address the merits of the constitutional issues raised in this case was in their reply briefs.

_____

[2] The LUPE Group refers to La Unión del Pueblo Entero, Oscar Silva, and Austin Community College.

24

The district court denied the motions to intervene, relying primarily on *Young Conservatives* to conclude that intervention was futile because the Challenged Provisions are preempted by § 1623(a). Its order did not address many of the independent arguments and defenses raised by Appellants, including that the district court lacked jurisdiction and that § 1623(a) violates the Tenth Amendment. It also denied the LUPE Group's motion to vacate and motion to stay as moot.

Appellants challenge the denial of intervention and argue that the consent judgment should be vacated on multiple grounds, including: (1) the district court lacks subject matter jurisdiction over the original action between the United States and Texas; (2) the district court should not have evaluated futility to resolve the motions to intervene; and (3) to the extent a futility analysis is warranted, § 1623(a) does not preempt the Challenged Provisions under a proper interpretation, and in any event, it is not a valid preemption statute under the Tenth Amendment.

## II

The LUPE Group argues that the district court's decision to deny intervention based on futility was "fundamentally flawed" because it "overlooked" many of their "meritorious arguments," including that the consent judgment should be vacated because the district court lacked subject matter jurisdiction over the action between the United States and Texas.

## A

As a threshold matter, Texas suggests that this court lacks appellate jurisdiction to consider the LUPE Group's jurisdictional argument because they are not parties and therefore cannot appeal the consent judgment itself.

"Federal courts must be assured of their subject matter jurisdiction at all times and may question it sua sponte at any stage of judicial proceedings."

No. 25-10898

*In re Bass*, 171 F.3d 1016, 1021 (5th Cir. 1999); *see also Juidice v. Vail*, 430 U.S. 327, 331 (1977) ("Although raised by neither of the parties, we are first obliged to examine the standing of appellees, as a matter of the case-or-controversy requirement associated with Art. III, to seek injunctive relief in the District Court."). With respect to intervention specifically, "it is . . . well-settled that '[a]n existing suit within the court's *jurisdiction is a prerequisite* of an intervention.'" *See Harris v. Amoco Prod. Co.*, 768 F.2d 669, 675 (5th Cir. 1985) (alteration in original) (emphasis added) (quoting *Kendrick v. Kendrick*, 16 F.2d 744, 745 (5th Cir. 1926)); *see also* Wright & Miller's Federal Practice & Procedure § 1917 (3d ed. 2026) ("Intervention presupposes the pendency of an action in a court of competent jurisdiction . . . ."). And the LUPE Group's jurisdictional argument is intertwined with their argument that intervention is not futile; they moved to intervene to seek vacatur of the consent judgment in part on jurisdictional grounds. As a result, it is appropriate to consider subject matter jurisdiction at this juncture.

B

The LUPE Group asserts that there was no Article III case or controversy between the United States and Texas because they agreed on the constitutional questions in this case and desired the same result, causing the district court to lack jurisdiction to enter the consent judgment.

Under Article III, "[f]ederal courts have subject matter jurisdiction only over a 'case' or 'controversy.'" *Deutsch v. Annis Enters., Inc.*, 882 F.3d 169, 173 (5th Cir. 2018) (quoting U.S. Const. art. III § 2, cl. 1). This "require[s] that a case embody a genuine, live dispute *between adverse parties*." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (emphasis added). As a result, the Supreme Court has long distinguished between "real" and "earnest" controversies containing "honest and actual antagonistic assertion[s] of rights by one [party] against another," over which federal

26

courts have jurisdiction, and "friendly" or "collusive" lawsuits, over which federal courts lack jurisdiction. *Muskrat v. United States*, 219 U.S. 346, 359 (1911) (citation modified); *United States v. Johnson*, 319 U.S. 302, 305 (1943) ("[This] suit is collusive because it is not in any real sense adversary. It does not assume the honest and actual antagonistic assertion of rights to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions . . . ." (citation modified)).

As this court has held, "[i]t is well settled that, where the parties agree on a constitutional question, there is no adversity and hence no Article III case or controversy." *Pool v. City of Houston*, 87 F.4th 733, 733–34 (5th Cir. 2023); *see also Space Expl. Techs. Corp. v. Nat'l Lab. Rels. Bd.*, 151 F.4th 761, 767 n.5 (5th Cir. 2025) ("When litigants desire precisely the same result, no case or controversy exists." (citation modified)); WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 3530 (3d ed. 2026) ("The principle remains today that if both parties affirmatively desire the same result, no justiciable case is presented."). This is why, when "confronted with the anomaly that both litigants desire precisely the same result, namely a holding" regarding the constitutionality of a statute, the Supreme Court has found "no case or controversy within the meaning of Art[icle] III of the Constitution." *See, e.g.*, *Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 47–48 (1971); *Muskrat*, 219 U.S. at 360–61; *Johnson*, 319 U.S. at 305. "It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." *Muskrat*, 219 U.S. at 360–61 (citation modified).

1

In *INS v. Chadha*, the Supreme Court found a justiciable case where the plaintiff challenged the constitutionality of a provision of the Immigration

27

and Nationality Act that served as a basis for denying his application for suspension of deportation. 462 U.S. 919, 925–28 (1983). "[INS] agreed with [the plaintiff's] position . . . and joined him in arguing that § 244(c)(2) is unconstitutional." *Id.* at 928. As a result, the Supreme Court considered whether the dispute presented a valid case or controversy or "a friendly, non-adversary, proceeding upon which the Court should not pass." *Id.* at 939 (citation modified). It found a justiciable case, notwithstanding INS's agreement with the plaintiff on the constitutional question, because "INS would have deported [the plaintiff]" in accordance with the challenged provision "absent . . . [a] judgment" that it was unconstitutional. *Id.* INS also remained an "aggrieved" party because a judgment rendering the challenged provision unconstitutional "prohibit[ed] it from taking action it would otherwise take." *Id.* at 930, 939.

Relying on *Chadha*, the Supreme Court again found a justiciable case in *United States v. Windsor*, 570 U.S. 744 (2013). In that case, the plaintiff was denied a tax refund following the death of her spouse because of a provision in the Defense of Marriage Act that "exclude[d] a same-sex partner from the definition of 'spouse' as that term is used in federal statutes." *Windsor*, 570 U.S. at 751–54. She asserted that the provision was unconstitutional. *Id.* at 753–54. The United States agreed, but it assured that it would continue to enforce the provision and withhold the tax refund until the courts resolved the constitutional question. *Id.* The Supreme Court held that "[t]he necessity of a 'case or controversy' to satisfy Article III [is] defined as a requirement that the Court's 'decision will have real meaning'" with respect to the parties. *Id.* at 758 (quoting *Chadha*, 462 U.S. at 939–40).

> [T]he refusal of the Executive to provide the relief sought suffices to preserve a justiciable dispute as required by Article III. In short, even where "the Government largely agree[s] with the opposing party on the merits of the controversy,"

there is sufficient adverseness and an "adequate basis for jurisdiction in the fact that the Government intended to enforce the challenged law against that party."

*Id.* at 759 (second alteration in original) (quoting *Chadha*, 462 U.S. at 940 n.12).

But in *Pool*, upon which the LUPE Group primarily relies to argue the district court lacked jurisdiction, this court found no Article III case or controversy in considering an appeal by the plaintiff regarding the "wording" of "a declaratory judgment that held unconstitutional certain voter-registration provisions in the Houston City Charter." 87 F.4th at 733. The parties in *Pool* "agreed from the beginning" of the lawsuit that the City of Houston's voter-registration provisions were "unconstitutional." *Id.* at 734 (citation modified). The City of Houston "also agreed that it would and could not enforce the provisions." *Id.* (citation modified). Observing that the City of Houston "repeatedly and consistently emphasized its agreement with the plaintiffs throughout [the] suit," this court labeled it a "faux dispute[]" that did "not belong in federal court" given that there was "no adversity and hence no Article III case or controversy." *Id.* at 734.

*Chadha*, *Windsor*, and *Pool* can be harmonized. In *Chadha* and *Windsor*, the defendants agreed with the plaintiffs on the constitutional questions while maintaining that they could and would nonetheless enforce the challenged statutes, unless those statutes were declared unconstitutional. Because they "refus[ed] to give . . . effect" to their "agree[ment] with [the plaintiffs'] legal contention[s]," *see Windsor*, 570 U.S. at 756, a judgment rendering the challenged statutes unconstitutional had the effect of "prohibiting" the defendants "from taking action [they] would otherwise take," *see Chadha*, 462 U.S. at 930. In contrast, in *Pool*, the City of Houston agreed with the plaintiff on the constitutional question *and* maintained that it "would [not] and could not enforce the [challenged] provisions." 87 F.4th at

29

734 (citation modified). The distinction between the holdings in *Chadha*, *Windsor*, and *Pool* suggests that, in cases where the parties agree on the constitutional question, jurisdiction appears to hinge on whether the defendant "refus[es] to give . . . effect" to its "agree[ment] with [the plaintiff's] legal contention." *See Windsor*, 570 U.S. at 756.

### 2

Here, the United States and Texas have undisputedly "agree[d] on [the] constitutional question"—whether the Challenged Provisions are preempted by § 1623(a)—"from the beginning" of this case. *See Pool*, 87 F.4th at 734 (citation modified). As a result, jurisdiction hinges on whether Texas has disclaimed enforcement of the Challenged Provisions, like the defendant in *Pool*, or "refus[es] to give . . . effect" to its "agree[ment] with [the United States'] legal contention," like the defendants in *Chadha* and *Windsor*. *See Windsor*, 570 U.S. at 756.

Texas maintains that, in contrast to *Pool*, Article III jurisdiction exists here because its Attorney General "could not and did not agree the State" would not enforce the Challenged Provisions. This, according to Texas, is because the Attorney General does not and cannot "enforce[]" "tuition rules" like the Challenged Provisions, as that authority lies with "the public universities who charge and collect those funds." *See* Tex. Educ. Code § 54.053. But there is arguably no functional difference between Texas's position and the City of Houston's position in *Pool* that it "would and could not enforce the provisions." *See* 87 F.4th at 734 (citation modified). As in *Pool*, Article III jurisdiction may be lacking.

On the other hand, Article III jurisdiction could exist because "[a] public university system is considered a state agency" and an "arm[] of the [S]tate," *Daniel v. Univ. of Texas Sw. Med. Ctr.*, 960 F.3d 253, 257 (5th Cir. 2020), so "a suit against [a public university] is a suit against the [State of

30

Texas]," *Sullivan v. Texas A&M Univ. Sys.*, 986 F.3d 593, 595 (5th Cir. 2021). And although on-the-ground implementation of the Challenged Provisions is not administered by the *Attorney General* because that authority has been delegated to public universities, the *State of Texas* "undoubtedly ha[s] an interest in enforcing [its] laws." *See Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 767 (5th Cir. 2023). There also appears to be no dispute that the Challenged Provisions were in effect until the district court entered the consent judgment, causing it to have "real meaning" by binding the State and its agents from enforcing the Challenged Provisions. *See Windsor*, 570 U.S. at 758 (quoting *Chadha*, 462 U.S. at 939–40). This is more consistent with *Chadha* and *Windsor*.

Given the lack of substantive adversarial briefing, the district court's failure to address the jurisdictional issue, and Texas's position that it *cannot* affirm whether it would give effect to its agreement with the United States' legal position, the existence of Article III jurisdiction is unclear. I would remand for the district court to consider its jurisdiction in the first instance. *See Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017).[3]

_____

[3] Relatedly, in *Windsor*, the Supreme Court observed that "[e]ven when Article III permits the exercise of federal jurisdiction, *prudential considerations* demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" 570 U.S. at 760 (emphasis added) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). But "the relevant prudential factors that counsel against hearing [a particular] case are subject to 'countervailing considerations,'" including "the extent to which adversarial presentation of the issues is assured by the participation of *amici curiae*" or intervenors "prepared to defend with vigor the constitutionality of the legislative act." *Id.* at 760–61 (quoting *Warth v. Seldin*, 422 U.S. 490, 500–01 (1975)). Here, there are serious and "inherent" prudential concerns given Texas's "unusual position." *See id.* at 759. Those concerns were exacerbated at the time the district court approved the consent judgment, just six hours after the lawsuit was filed and without inviting any adversarial briefing. Appellants' intervention could have satisfied those prudential concerns, but the district court denied that, too, hinging its decision on the merits—without fulsome briefing.

No. 25-10898

## III

Even if the district court had subject matter jurisdiction, Appellants argue that it erred in denying their motions to intervene based on futility because it should have instead only evaluated the Rule 24 intervention factors, which they satisfy. They also assert that, to the extent a futility analysis is proper, the district court applied the wrong standard and its analysis "contained significant gaps and errors."

## A

Under Rule 24 of the Federal Rules of Civil Procedure, a motion to intervene "must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." FED. R. CIV. P. 24(c).

This court has held that "Rule 24(c) obligates a district judge to make an assessment of whether the proposed intervenor's complaint states a cause of action, at least when the motion to intervene is opposed, and where . . . the complaint in intervention adds substantive claims that no other party asserted." *Pin v. Texaco, Inc.*, 793 F.2d 1448, 1450 (5th Cir. 1986). Accordingly, "as a threshold matter, the district judge must determine whether the intervenor's complaint states a cause of action before he turns to a consideration of the factors listed in Rule 24(a) and (b) governing whether intervention is appropriate." *Id.* To determine "whether the proposed intervenor's complaint states a cause of action," courts should use a Rule 12(b)(6) standard. *See id.*

---

Although these concerns are prudential, rather than jurisdictional, they too would be worth consideration by the district court on remand.

32

No. 25-10898

This court has not directly addressed whether Rule 24(c) similarly requires district courts to determine the sufficiency of the pleadings for defense-side proposed intervenors. But in *Pin*, we quoted with approval the First Circuit's observation that a proposed intervenor under Rule 24 is required to "state a well pleaded claim *or defense* to the action." *Id.* (emphasis added) (quoting *R.I. Fed'n of Tchrs. v. Norberg*, 630 F.2d 850, 854–55 (1st Cir. 1980)); *see also* Wright & Miller's Federal Practice & Procedure § 1914 (3d ed. 2026) ("The proposed pleading must state a good claim for relief *or a good defense.* . . . The general rules on testing a pleading are applicable here." (emphasis added)). And Rule 24(c) does not distinguish between "claim[s] or defense[s]"—it simply mandates that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Appellants cite no authority or prudential reason demonstrating that this court should permit futility analyses for plaintiff-side intervenors but not defense-side intervenors. As a result, under this court's precedent, the district court appropriately conducted a futility analysis before turning to the Rule 24 factors to resolve Appellants' motions to intervene.[4]

_____

[4] *Pin* observed that courts "*must* determine whether the intervenor's complaint states a cause of action before [they] turn[] to a consideration of the [Rule 24] factors," but it appeared to limit this "obligat[ion]" to circumstances where "the motion to intervene is opposed, and . . . the [pleading] in intervention adds substantive claims [or defenses] that no other party asserted." 793 F.2d at 1450 (emphasis added). Those circumstances exist here, so a futility analysis is proper under our precedent. But it may be good practice, particularly where complex and weighty constitutional issues are at play, for district courts conducting futility analyses to ensure they have the benefit of fulsome merits briefing. They could do so by, for example, requesting supplemental briefs where, as here, the motions to intervene focus almost exclusively on Rule 24 factors rather than the merits.

No. 25-10898

B

Nevertheless, the question remains regarding whether the district court applied the appropriate standard when conducting its futility analysis. The district court here purported to apply a Rule 12(b)(6) standard. *See* But there were no "claim[s]" that Appellants could have "fail[ed] to state" because they sought to intervene as *defendants* to defend the Challenged Provisions. *See* Fed. R. Civ. P. 12(b)(6). Under the "general rules on testing a pleading," *Pin*, 793 F.2d at 1450 (citation modified), Rule 12(c) provides the standard under which a challenge to "the entire case may be lodged to test the sufficiency of defenses raised by a defending party if (1) there is no dispute over material facts, (2) there are no other valid defenses that have been raised, and (3) the plaintiff is entitled to judgment as a matter of law," Wright & Miller's Federal Practice & Procedure § 1367 (3d ed. 2026) (citation modified).

Although the "standard for a Rule 12(c) motion is the same as the standard used for Rule 12(b)(6) motions," the distinction between the two is critical in this case. *See Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 454 (5th Cir. 2022). By applying a Rule 12(b)(6) standard, the district court appears to have only evaluated the legal sufficiency of the express preemption *claim* asserted by the United States, rather than *also* evaluating the sufficiency of Appellants' proposed *defenses*. And notably, one of those defenses—that § 1623(a) violates the Tenth Amendment and is not a valid preemption statute—could render intervention *not* futile even if the United States' express preemption claim is otherwise meritorious. Because, under the Rule 12(c) standard, that Tenth Amendment defense must be addressed as part of the futility analysis, the district court's analysis was incomplete.

34

No. 25-10898

IV

Appellants argue, in relevant part, that the district court erred in denying intervention based on futility because § 1623(a) violates the Tenth Amendment and is not a valid preemption statute under *Murphy v. NCAA*, 584 U.S. 453 (2018).

A

The Tenth Amendment "anticommandeering doctrine . . . is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 584 U.S. at 470. It prohibits the federal government from "dictat[ing] what a state legislature may and may not do," *id.* at 474, "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts," *New York v. United States*, 505 U.S. 144, 166 (1992). This is because "[t]he Constitution . . . 'confers upon Congress the power to regulate *individuals*, not States.'" *Murphy*, 584 U.S. at 472 (emphasis added) (quoting *New York*, 505 U.S. at 166). Moreover, "[t]he basic principle—that Congress cannot issue direct orders to state legislatures—applies" both when Congress attempts to "*compel* a State to enact legislation" and "*prohibit[]* a State from enacting new laws." *Id.* at 474–75 (emphasis added).

The Supreme Court has explained that "the anticommandeering principle is important" for three primary reasons. *Id.* at 473–74. "First, the rule serves as 'one of the Constitution's structural protections of liberty,'" *id.* at 473 (quoting *Printz v. United States*, 521 U.S. 898, 921 (1997)), by fostering a "healthy balance of power between the States and the Federal Government," *id.* (citation modified). Second, it "promotes political accountability" because "if a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred." *Id.* at 473–

35

74. And "[t]hird, the anticommandeering principle prevents Congress from shifting the costs of regulation to the States." *Id.* at 473.

### B

Appellants argue that § 1623(a) violates the Tenth Amendment and is not a valid preemption statute under *Murphy* because it operates as a regulation on States rather than on private actors.

In *Murphy*, the Supreme Court explained how to distinguish between permissible preemption and impermissible commandeering. *See* 584 U.S. at 477–80.[5]

> Preemption is based on the Supremacy Clause, and that Clause is not an independent grant of legislative power to Congress. Instead, it simply provides a rule of decision. It specifies that federal law is supreme in case of a conflict with state law. Therefore, in order for [a federal] provision to preempt state law, it must satisfy two requirements. First, it must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do. Second, since the Constitution confers upon Congress the power to regulate individuals, not States, the [federal] provision at issue must be best read as one that regulates private actors.

*Id.* at 477 (citation modified).

To determine whether a federal provision regulates private actors or States, courts should "look beyond" "the way in which a preemption provision is phrased" and focus instead on how the "provision operates." *Id.*

---

[5] *See also* Edward A. Hartnett, *Distinguishing Permissible Preemption from Unconstitutional Commandeering*, 96 Notre Dame L. Rev. 351, 351 (2020) (noting that "the preemption doctrine and the anticommandeering doctrine" have, at times, "lived in an uneasy tension").

No. 25-10898

at 478. "In sum, regardless of the language sometimes used by Congress and this Court, *every form of preemption* is based on a federal law that *regulates the conduct of private actors*, not the States." *Id.* at 479 (emphasis added). A preemption provision that, in effect, operates as "a direct command to the States . . . is exactly what the anticommandeering rule does not allow." *Id.* at 480.[6]

Here, § 1623(a) generally forbids "an alien who is not lawfully present" from being "eligible" for a "postsecondary education benefit" "on the basis of residence," except when "a citizen or national" is "eligible for such a benefit" without regard to residency. 8 U.S.C. § 1623(a). But § 1623(a) "does not confer any federal *rights* on private actors." *See Murphy*, 584 U.S. at 480 (emphasis added); *see also Young Conservatives*, 73 F.4th at 313 ("Section 1623(a) . . . burdens Texas with no duty related to U.S. citizens."). "Nor does it impose any federal *restrictions* on private actors," *see Murphy*, 584 U.S. at 480 (emphasis added), because it does not restrict "alien[s]" from doing anything, *see* 8 U.S.C. § 1623(a).[7] Section 1623(a) instead regulates only *eligibility* for postsecondary education benefits based on residency. *See Young Conservatives*, 73 F.4th at 313 (stating § 1623(a) "declar[es] a limitation on illegal alien eligibility itself").

It is the province of the *States* to set their own residency requirements, tuition rates, and eligibility requirements for postsecondary education

---

[6] *See also* Hartnett, *supra* note 5, at 352 ("[T]he right distinction is between federal laws that regulate the people directly (and accordingly can permissibly preempt state law) and federal laws that regulate the state's regulation of the people (and are therefore unconstitutional attempts at commandeering).").

[7] For example, § 1623(a) does not restrict noncitizens from *accepting* postsecondary education benefits based on state residency, nor does it impose a penalty for doing so. Likewise, § 1623(a) does not restrict any private actors from establishing postsecondary education benefits based on state residency.

No. 25-10898

benefits based on state residency. As a result, the only entities that can determine "illegal alien eligibility" for the public benefits contemplated by § 1623(a) are, in fact, the States. *See id.* Consequently, § 1623(a) "operates" to "regulate[] the conduct of . . . the States"—not private actors. *See Murphy*, 584 U.S. at 478–80 ("[I]t is clear that the PASPA provision . . . is not a preemption provision because there is no way in which this provision can be understood as a regulation of private actors."). Like the federal preemption provision the Supreme Court invalidated in *Murphy*, "there is simply no way to understand [§ 1623(a)] . . . as anything other than a direct command to the States." *See id.* at 480.

C

Appellees maintain that this court already held that § 1623(a) does not "regulate[] states directly" in *Young Conservatives*, essentially foreclosing Appellants' Tenth Amendment argument. *See* 73 F.4th at 313.

1

In *Young Conservatives*, this court considered whether the district court erred in concluding that § 1623(a) preempts § 54.051(d) of the Texas Education Code, which sets out the tuition rates for nonresidents. *Id.* at 307–08 (citing Tex. Educ. Code § 54.051(d)). Specifically, the district court reasoned that, under § 1623(a): "If a State makes an unlawfully present alien eligible for a postsecondary education benefit on the basis of state residency, *it must* make a United States citizen eligible for the same benefit regardless of whether the citizen is such a resident." *Id.* at 312 (emphasis added). This court found that interpretation of § 1623(a) erroneous and inconsistent with its plain text:

> The district court's new "rule" says, in essence, "that if a state says illegal aliens are eligible, it shall say that U.S. citizens are eligible." This is wrong in several ways. First, unlike the

38

statute, the district court imposes a duty—i.e., it uses the wrong definition of shall. Unlike the statute as written, which is *entirely prohibitory and limits what can properly be done*, the *court's rule demands action*. Second, it moves shall to the wrong side of the sentence. Rather than using the statute's proper "if A, then B" form ("if immigrants shall be eligible, U.S. citizens are"), the [district] court has it backwards ("if immigrants are eligible, U.S. citizens shall be"). Third, it changes the object of the statute's regulation. *Now, rather than declaring a limitation on illegal alien eligibility itself, the court's rule regulates states directly. In short, the district court applied an entirely different rule than the one Congress passed.*

*Id.* at 312–13 (emphasis added).

Under a "proper reading of § 1623(a)," this court held, "the statute expressly preempts state rules that grant illegal aliens benefits when U.S. citizens haven't received the same." *Id.* at 313. Still, "§ 1623(a) doesn't impose *any* duty to grant the same benefits to U.S. citizens" because "[i]ts sole focus is on improper benefits for illegal aliens." *Id.* It "simply requires that all U.S. citizens be eligible for a benefit, without regard to residency, before any alien be able to receive the same benefit (based on residency)." *Id.* at 312. As a result, *Young Conservatives* held § 54.051(d) was not expressly preempted because it "does not grant . . . benefits" and merely "set[s] the tuition price for nonresident students, citizens or not," without taking a "stance on whether illegal aliens are eligible for a cheaper price." *Id.* at 313.[8]

---

[8] *Young Conservatives* also held that § 54.051(d) was not conflict preempted by § 1623(a) because the "calculat[ion] and impos[ition] [of] a nonresident tuition rate . . . has nothing to do with § 1623(a)'s mandate that illegal aliens are ineligible for in-state benefits unless U.S. citizens are," and because "§ 54.051(d) does not hamper Congress's § 1623(a) objectives." 73 F.4th at 313–14. But it observed that "a different, unchallenged portion of Texas' scheme seems to conflict with § 1623(a)." *Id.* at 314. Conflict preemption has not been raised and is not at issue here. And the observation has no bearing on the Tenth Amendment issue in this case.

No. 25-10898

2

Whether § 1623(a) complies with the Tenth Amendment was not raised or considered in *Young Conservatives*. And its observations regarding the extent to which § 1623(a) regulates States are cabined to its critique of the district court's interpretation of the statute. That interpretation, according to *Young Conservatives*, erroneously changed § 1623(a) from a rule "declaring a limitation on illegal alien eligibility itself" to a rule that "regulates states directly"—specifically by "impos[ing] [a] duty to grant the same benefits to U.S. citizens." *See id.* at 312–13. It found that the district court's interpretation of § 1623(a) imposed an *affirmative* command on the States to grant benefits, which was erroneous because, "as written," § 1623(a) is "entirely *prohibitory* and limits what can properly be done." *See id.* (emphasis added) (citation modified).

Although § 1623(a) does not contain "an affirmative federal command to *do* something," the anticommandeering doctrine applies equally to federal laws "*prohibiting* a State from enacting new laws." *Murphy*, 584 U.S. at 463, 474 (emphasis added). And here, "if we look beyond the phrasing employed in" § 1623(a), "this provision operates," *id.* at 478, as a "prohibit[ion]," *see Young Conservatives*, 73 F.4th at 313. It prohibits States from granting in-state tuition to "an alien who is not lawfully present in the United States" based on state residency. 8 U.S.C. § 1623(a).[9]

_____

[9] It also does not appear that this court's statement that § 1623(a) does not "regulate[] states directly" was "necessary to the result" of *Young Conservatives*, because whether § 1623(a) directly regulated the States *in any regard* was not dispositive. *See U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 428 (5th Cir. 2014), *as revised* (Sept. 2, 2014) (citation modified) (holding a statement is dicta and non-binding when it is not "necessary to the result" of the case). What *was* dispositive was the court's holding that § 1623(a) imposes no duty on States to *grant* benefits to U.S. citizens and instead regulates "improper benefits for illegal aliens." *Young Conservatives*, 73 F.4th at 313. As discussed, that interpretation of § 1623(a) does not foreclose Appellants' Tenth

40

No. 25-10898

We have made clear that § 1623(a) is a "limitation on illegal alien eligibility [for postsecondary education benefits based on residency] itself." *See Young Conservatives*, 73 F.4th at 313. Accordingly, it cannot operate as a regulation *on individuals*. If § 1623(a) also does not operate as a regulation *on States* in any capacity, § 1623(a) would regulate *no one. Young Conservatives* does not foreclose Appellants' Tenth Amendment claim.[10]

\* \* \*

Section 1623(a) must be a valid preemption statute to preempt the Challenged Provisions, which means it must regulate private actors rather than the States. *See Murphy*, 584 U.S. at 479. Because § 1623(a) prohibits States from conferring postsecondary education benefits based on residency, "there is simply no way to understand the provision . . . as anything other than a direct command to the States." *Id.* at 480. "[T]hat is exactly what the anticommandeering rule does not allow." *Id.* As a result, § 1623(a) is not a valid preemption provision, so intervention was not futile because Appellants had a meritorious defense against the United States' express preemption claim.

---

Amendment argument because the anticommandeering principle applies equally to federal commands of "affirmative" action and those "imposing a prohibition." *Murphy*, 584 U.S. at 475.

[10] Notably, under Texas law, it is the universities that both determine students' eligibility for in-state tuition and collect payments. *See* Tex. Educ. Code §§ 54.053, 54.051(b). Because § 1623(a) targets States' abilities to confer these public benefits, the public universities will be charged with carrying out § 1623(a)'s aims, further demonstrating its impermissible commandeering. *See Murphy*, 584 U.S. at 474 ("[T]he anticommandeering principle prevents Congress from shifting the costs of regulation to the States.").

No. 25-10898

V

In resolving Appellants' motions to intervene, the district court conducted an incomplete futility analysis that overlooked issues relating to both its subject matter jurisdiction and Appellants' meritorious defenses to the United States' express preemption claim. I would remand for the district court to consider its subject matter jurisdiction in the first instance. But even if jurisdiction exists, I would reverse and remand because the district court erred in denying Appellants' motions to intervene based on futility, as § 1623(a) is not a valid preemption statute and, consequently, does not preempt the Challenged Provisions.

# United States Court of Appeals
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

July 09, 2026

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

      No. 25-10898   USA v. State of Texas
                     USDC No. 7:25-CV-55


Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain  typographical  or  printing  errors  which  are  subject  to
correction.)

Fed. R. App. P. 39 through 41, and Fed. R. App. P. 39, 40, and 41
govern costs, rehearings, and mandates.  **Fed. R. App. P. 40 require
you to attach to your petition for panel rehearing or rehearing en
banc an unmarked copy of the court's opinion or order.**  Please
read carefully the Internal Operating Procedures (IOP's) following
Fed. R. App. P. 40 for a discussion of when a rehearing may be
appropriate, the legal standards applied and sanctions which may
be imposed if you make a nonmeritorious petition for rehearing en
banc.

Direct Criminal Appeals.  Fed. R. App. P. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

Pro Se Cases.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

Court Appointed Counsel.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari**.  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

The judgment entered provides that Appellants pay to Appellees the costs on appeal.  A bill of cost form is available on the court's website www.ca5.uscourts.gov.

Sincerely,

LYLE W. CAYCE, Clerk

*Amanda M. Duroncelet*

By: _____
Amanda M. Duroncelet, Deputy Clerk
504-310-7636

Enclosure(s)

Mr. Andrew Marshall Bernie
Mr. Simon Christopher Brewer
Ms. Tanya Broder
Mr. William Francis Cole
Mr. Andres Correa
Mr. Matt A. Crapo
Mr. Yaman Desai
Mr. Zachary Dolling
Mr. David A. Donatti
Ms. Paige Duggins-Clay
Mr. Drew C. Ensign
Ms. Kristin M. Etter
Ms. Lauren Elizabeth Fascett
Mr. Kyle Aaron Gardner
Ms. Kassandra Gonzalez
Mr. Daniel Hatoum
Mr. Luis Leonardo Lozada
Mr. Ralph Michael Molina
Ms. Celina Y. Moreno
Mr. Fernando Nunez
Mr. Efren Carlos Olivares
Mr. Christopher W. Patton
Ms. Nina Perales
Ms. Adriana Cecilia Pinon
Mr. Nathaniel Anson Plemons
Mr. Zachary Louis Rhines
Ms. Madeleine Rodriguez
Mr. Thomas Andrew Saenz
Mr. Edgar Saldivar
Mr. Joshua Marc Salzman
Mr. Daniel Bentele Hahs Tenny
Ms. Margaret Dunlay Terwey
Mr. Ryan Daniel Walters
Mr. Brian Wolfman
Ms. Zhenmian Xu